1  Matthew L. Sharp
   MATTHEW L. SHARP, LTD.
2  Nevada Bar No. 4746
   432 Ridge Street
3  Reno, Nevada 89501
4  Telephone:      (775) 324-1500

5  Robert I. Harwood
   Matthew M. Houston
6  Benjamin I. Sachs-Michaels
   *Pro Hac Vice Applications to be filed*
7  HARWOOD FEFFER LLP
8  488 Madison Avenue
   New York, NY 10022
9  Telephone:      (212) 935-7400

10 Louis Boyarsky
   *Pro Hac Vice Application to be filed*
11 GLANCY BINKOW & GOLDBERG LLP
12 1925 Century Park East, Suite 2100
   Los Angeles, California 90067
13 Telephone:      (310) 201-9150
14 *Attorneys for Plaintiff*

                  **UNITED STATES DISTRICT COURT**
15                    **DISTRICT OF NEVADA**

16

17 TYLER GRAY, Derivatively on Behalf of     Case No.
   Nominal Defendant MEDBOX, INC.,

18                                           **VERIFIED SHAREHOLDER**
                  Plaintiff,                 **DERIVATIVE COMPLAINT FOR**
19                                           **BREACH OF FIDUCIARY DUTY AND**
          v.                                 **ABUSE**
20
   PEJMAN VINCENT MEHDIZADEH,
21 MATTHEW FEINSTEIN, BRUCE
   BEDRICK, THOMAS IWANSKI, GUY
22 MARSALA, J. MITCHELL LOWE, NED            **DEMAND FOR JURY TRIAL**
   SIEGEL, JENNIFER S. LOVE, and C.
23 DOUGLAS MITCHELL,

24
                  Defendants,
25        and

26 MEDBOX, INC.,

27
                  Nominal Defendant.
28

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

302252.1

Plaintiff, Tyler Gray ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint (the "Complaint") for the benefit of nominal defendant, Medbox, Inc. ("Medbox" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

## NATURE AND SUMMARY OF THE ACTION

1.     Medbox provides software and consulting services to medical marijuana dispensaries and sells a patented vending machine designed to dispense medical marijuana. The Company was founded in 2010 by defendant Pejman Vincent Mehdizadeh ("Mehdizadeh"). From the founding of Medbox until March 2015, defendant Mehdizadeh was the majority shareholder of Medbox and controlled the business activities of Medbox.

2.     Completely disregarding his fiduciary responsibilities as a majority shareholder, officer, and director of a publicly traded company, defendant Mehdizadeh has used and abused Medbox as if it were his private play toy and failed to operate the business pursuant to the requirements of a publicly traded Company. In his own words, Mehdizadeh "was involved in almost every decision the company made."

3.     These decisions run the gamut of unacceptable behavior for a corporate fiduciary. For example, in 2012 Mehdizadeh decided to compensate himself to the tune of over $410,706 at a time when his only role was as a "consultant." At the same time, the Company's *net income* for 2012 was only $327,853 and the Company's Chief Executive Officer ("CEO") was earning only $65,000, or approximately one-seventh of the compensation earned by consultant Mehdizadeh.

4.     Defendant Mehdizadeh's decisions also include acts that bespeak of moral turpitude and a desire to deceive investors, such as: (a) hiring an "independent" auditor that has been censured by the Public Accounting Oversight Board and is currently the subject, along with the Company, of a U.S. Department of Justice ("DOJ") grand jury; (b) attempting to conceal from investors that he is a convicted felon due to a con in which he and his father pretended to be attorneys and stole over $450,000 from people in need; (c) publicly denying that the Company was under investigation by the SEC when in fact the Company *was and is* under investigation by

1 the SEC; and (d) issuing false and misleading press releases without authorization under the

2 Medbox name and logo at a time when he was neither and officer nor a director of the Company.

3      5.     Due to defendant Mehdizadeh's direct and personal involvement in Medbox, he

4 knew that since at least the beginning of 2013 the Company's financial statements were

5 inaccurate. These inaccuracies were so pervasive that they include, for example: (a) the issuance

6 of press releases in 2013 claiming the Company had "booked" $2 million in revenue in the first

7 quarter of 2013 when it had not; (b) the issuance of at least two sets of distinct financial statements

8 reporting different results for the third quarter of 2013; and (c) the December 30, 2014

9 announcement that Medbox would be forced to restate its financial statements for at least the full

10 year of 2013 and the first three quarters of 2014, and potentially financial statements from 2012 as

11 well due to material errors.

12      6.     Compliant in these fiduciary breaches were the directors charged with leading the

13 Company. Since 2013, there have been four distinct iterations of the Medbox's Board of

14 Directors. Defendant Mehdizadeh has used his position as a majority shareholder to appoint and

15 terminate directors at will and has completely dominated Medbox's Board and the corporation for

16 his own benefit. This tactic has resulted in a rarely-seen level of Board turnover summarized as

17 follows:

18
19
| **Board 1** (2013 – April 2014)[1] | **Board 2** (April 2014 – August 2014) | **Board 3** (August 2014 – October 2014) | **Current Board**[2] (October 2014 – Present) |
|---|---|---|---|
| Mehdizadeh | | | |
| Bedrick[3] | Bedrick | | |
| | Feinstein | Feinstein | |
| | Lowe | Lowe | Lowe |
| | Siegel | Siegel | Siegel |
| | | Marsala | Marsala |
| | | | Love |

26 _____

[1]     Dates are approximate since not all directors of a particular Board were appointed on the same day.

[2]     For the purposes of demand futility, the relevant Board is the Current Board.

[3]     Defendants Bedrick, Feinstein, Lowe, Siegel, Marsala, and Love are defined herein.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

                                

7.     Although the aforementioned breaches of fiduciary duties are sufficient to state a claim without more, the following recent events specifically precipitated the filing of this Complaint.   The Company disclosed on October 31, 2014 that: (a) a federal grand jury was investigating matters pertaining to Medbox and had issued a subpoena to the Company's public accountant; and (b) a whistleblower had contacted the U.S. Securities and Exchange Commission (the "SEC") alleging that defendant Mehdizadeh had engaged in insider trading and securities fraud.   Incredibly, the majority of the Current Board knew about the grand jury investigation since August 2014, but concealed its existence from shareholders and took no action for three months.

8.     Beginning on November 3, 2014, defendant Mehdizadeh issued a series of press releases denying that the Company was under investigation by the SEC.   This forced the Company to file a Form 8-K on November 7, 2014 stating that Mehdizadeh's November 3 press release was unauthorized and directing investors to rely on the original October 31, 2014 disclosure regarding the SEC whistleblower and grand jury investigation.   On November 12, 2014, the Company filed a Form 10-Q with the SEC which, among other things, confirmed that the SEC "is conducting an investigation pertaining to the Company and issued a subpoena."   Defendant Mehdizadeh's commitment to concealing the truth about Medbox and his activities would not stop at issuing false press releases, however.

9.     On December 22, 2014, apparently worried his wrongdoing was about to be exposed, defendant Mehdizadeh issued a press release defending the Company's revenue recognition and downplaying it as a "difference of opinion."   As described herein, the Company subsequently acknowledged that this press release was false and/or misleading.

10.     On March 9, 2015, the Company disclosed that it had completed its financial review and stated that it planned to file amended and restated Forms: (a) 10 containing financial statements for the years 2012 and 2013; and (b) 10-Q for the first, second, and third quarters of 2014.   As a result of the misleading accounting, Medbox overstated its revenue over $1.3 million during 2012, and $3 million during 2013, in both cases the overstatement was greater than the Company's total restated revenue during those periods.

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

11.     Demonstrating a stunning lack of corporate governance, defendants are unable to meet even the rudimentary requirement to have an independent Audit Committee.  From the beginning of 2013 until August 2014, upon information and belief, Medbox's Board never had an Audit Committee.   The Board never disclosed the existence of an Audit Committee, its membership, or an Audit Committee charter.  When the Company finally publicly disclosed an Audit Committee charter adopted in August 2014 on its website, the charter required the Committee be comprised of three independent directors.  As of August 2014, Medbox had never – during its entire corporate history – had three outside directors, let alone three legitimately independent ones, on the Board at once.  Nor did it in August 2014.  Finally, in October 2014 the stars aligned and three outside directors were on the Board at once, making it possible for the first time to convene an Audit Committee.  However, the Company *still* does not have a properly comprised, functioning Audit Committee.  Even now, the Audit Committee of Medbox's Board only has two members in contravention of its own charter.

12.     Plaintiff has made no pre-suit demand on the Board because any such demand would be a futile and useless act.  The Current Board of Medbox is comprised of defendants Siegel, Lowe, Marsala, and Love.  These defendants have admitted in court filings that defendant Mehdizadeh has committed a wide range of wrongdoing at Medbox and that the Company suffers from pervasive corporate governance deficiencies.  A majority of the Current Board, defendants Siegel, Lowe, and Marsala were on Medbox's Board in August 2014 when they were alerted to the grand jury investigation and SEC whistleblower but they declined to take any action or disclose same for approximately three months.  The Current Board has not sued defendant Mehdizadeh to recover the funds that he has stolen and/or improperly caused the Company to spend, nor has the Current Board enacted the necessary corporate governance enhancements to ensure Medbox is run like a legitimate enterprise.

13.     Each of defendants has breached his or her fiduciary duties in connection with the allegations herein and the Company has been seriously harmed by these breaches of fiduciary duties.

**JURISDICTION AND VENUE**

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Illinois, and no Defendant is a citizen of that state. This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

15. Venue is proper in this Court because Medbox maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Director Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

**A.    Plaintiff**

16. Plaintiff is a citizen of Illinois and is, and was at all times relevant hereto, an owner and holder of Medbox common stock.

**B.    Defendants**

The Company

17. Nominal defendant Medbox is a corporation incorporated under the laws of the State of Nevada, which maintains its principal executive offices at 8439 West Sunset Blvd., Suite 101 West Hollywood, California. Medbox provides consulting, services, and products to marijuana dispensaries. Medbox's common stock trades over the counter ("OTC") under the symbol "MDBX."

Current Board Members and Officers

18. Guy Marsala ("Marsala") has served as President and CEO, and a director, of Medbox since July 23, 2014. Defendant Marsala was a member of Board 3 and is a member of the Current Board. Upon information and belief, defendant Marsala is a citizen of California.

19. J. Mitchell Lowe ("Lowe") has served as a director of Medbox since March 2014. Defendant Lowe was a member of Boards 2 and 3, and is a member of the Current Board. Defendant Lowe is the Chairperson of the Compensation Committee and a member of the

1  Governance and Nominating Committee.  Upon information and belief, defendant Lowe is a

2  citizen of California.

3      20.    Ned Siegel ("Siegel") has served as a director of Medbox since April 2014.

4  Defendant Siegel was a member of Boards 2 and 3, and is Chairman of the Current Board.

5  Defendant Siegel is also a member of the Audit Committee, the Compensation Committee, and the

6  Governance and Nominating Committee.  Upon information and belief, defendant Siegel is a

7  citizen of Florida.

8      21.    Jennifer S. Love ("Love") has served as a director of Medbox since October 22,

9  2014 and is a member of the Current Board.  Defendant Love is the Chairperson of the Audit

10  Committee.  Upon information and belief, defendant Love is a citizen of Missouri.

11      22.    C. Douglas Mitchell ("Mitchell") became Medbox's CFO on October 21, 2014 and

12  continues to serve in that role.  Upon information and belief, defendant Mitchell is a citizen of

13  California.

14  Past Directors and Officers

15      23.    Defendant Mehdizadeh is a former CEO, the founder, and was the majority

16  shareholder of Medbox until March 2015.  Defendant Mehdizadeh founded a predecessor

17  company to Medbox in 2008 and acquired partial control of Medbox in 2011 and complete control

18  in 2012 when he purchased all of the outstanding shares.  Defendant Mehdizadeh served as a

19  senior consultant to the Company from December 2012 until May 2013, when he was appointed

20  as the Company's Chief Operating Officer ("COO") and Chairman of the Board of Directors.  On

21  April 10, 2014, Mehdizadeh resigned as COO and a director and became a "Senior Strategist."  On

22  October 13, 2014, Mehdizadeh resigned as Senior Strategist of the Company but continued to

23  serve as a consultant to the Company.  On January 9, 2015, entities controlled by defendant

24  Mehdizadeh illegally executed a written consent installing him once again as Chairman of the

25  Board effective January 29, 2015.  The written consent was later withdrawn.  Defendant

26  Mehdizadeh was a member of Board 1.  Upon information and belief, defendant Mehdizadeh is a

27  citizen of California.

28

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

24.     Matthew Feinstein ("Feinstein") was to be appointed director effective January 29, 2015 by the Mehdizadeh controlled entities via the illegal and subsequently withdrawn January 9, 2015 written consent.   Upon information and belief, Feinstein is currently Medbox's Interim President.  Defendant Feinstein worked as a consultant for Medbox beginning in June 2013 and became a Vice President in February 2014.   Feinstein previously served as a director of the Company from April 2014 until October 2014.  Defendant Feinstein was a member of Boards 2 and 3.  Upon information and belief, defendant Feinstein is a citizen of California.

25.     Bruce Bedrick ("Bedrick") served as the Company's CEO from December 2011 until July 23, 2014.  Defendant Bedrick served as a director of Medbox from December 2011 until August 18, 2014, as a member of Boards 1 and 2.  Although Medbox's public filings routinely referred to defendant Bedrick as a "physician" and stated he possessed medical expertise relevant to the Company's business, in fact defendant Becker is a chiropractor, not a physician and does not hold an M.D.  Upon information and belief, defendant Becker is a citizen of Airzona.

26.     Thomas Iwanski ("Iwanski") served as the Company's Chief Financial Officer ("CFO") from February 2014 until he resigned on October 16, 2014.  Defendant Iwanski initially joined Medbox in April 2013 as an accounting consultant.   Upon information and belief, defendant Iwanski is a citizen of California.

**DEFENDANTS' DUTIES**

27.     By reason of their positions as officers, directors, and/or fiduciaries of Medbox and because of their ability to control the business and corporate affairs of Medbox, defendants owed Medbox and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Medbox in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Medbox and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Medbox and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     Defendants, because of their positions of control and authority as directors and/or officers of Medbox, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Medbox, each of the defendants had knowledge of material non-public information regarding the Company.

29.     To discharge their duties, the officers and directors of Medbox were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Medbox were required to, among other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

d.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

## BACKGROUND

30.     The predecessor entity to Medbox was incorporated in Nevada as Rabatco, Inc.  In 2000, the Company's name was changed to MindfulEye, Inc. ("MindfulEye").  MindfulEye's business was operating self-serve kiosks where consumers could download movies onto a flash drive.  According to a MindfulEye filing on the OTC website, the movies sold at the Company's

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1   kiosks were "adult" films.  MindfulEye's revenues for 2010 were $0 and its cash on hand on

2   March 31, 2011 was $23,689.  Even though they had almost no value, shares of MindfulEye were

3   tradable over the counter.

4        31.      On August 30, 2011, in contemplation of defendant Mehdizadeh's acquisition of

5   the Company, MindfulEye's name was changed to Medbox.  On November 25, 2011, defendant

6   Mehdizadeh purchased 50% of the outstanding common stock of the Company.  Thereafter,

7   defendant Mehdizadeh, through PVMI, Inc. ("PVMI"), an entity he wholly owns, acquired all of

8   the outstanding shares of the Company during 2012.

9                            **SUBSTANTIVE ALLEGATIONS**

10       32.      On April 2, 2013, the Company issued a press release titled "Medbox Completes

11  Financial Audit," which states in part:

12       HOLLYWOOD, Calif., April 2, 2013 /PRNewswire/ -- Medbox, Inc. (OTC
         Markets: MDBX) (www.medboxinc.com), announced it has cleared a financial
13       audit of its prior 2 years of operations. Q Accountancy Corporation of Irvine,
         California headed up the audit as a public company accountancy and oversight
14       board (PCAOB) certified firm that specializes in complex audits of this size and
15       scope.

16                                    *  *  *

17       Medbox reports that all $673,000 in deferred revenue was paid in Q1 2013 and as a
         result added to that quarter's revenue figures *making Q1 2013 revenue well in*
18       *excess of $2 million* - a company record.

19                                    *  *  *

20
         "We are absolutely thrilled that we have cleared this proverbial hurdle in our
21       company's history," stated Dr. Bruce Bedrick, CEO of Medbox, Inc.   "We
         anticipate filing our Form 10 by Friday and 60 days thereafter the filing shall be
22       deemed effective. We want to thank all of our supporters that helped us in
         becoming a viable public company."
23

24  (Emphasis added.)

25       33.      Unfortunately for Medbox and its shareholders, although the engagement of a

26  public accounting firm should have led to more accurate financial reporting and transparency, this

27  was not to be. When defendant Mehdizadeh, who at the time was Medbox's "Senior Consultant

28  and Founder" and defendant Becker, then Medbox's CEO, decided to engage Q Accountancy

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

Corporation ("Q Accountancy") they did so knowing that the accountant would be no more than a rubber stamp for their financial manipulations and untruthful disclosures.   About six months earlier, on September 27, 2012, the Public Company Accounting Oversight Board had issued a report after an inspection of Q Accountancy.  The report, which is publicly available, provides a grim foreshadowing of the situation at Medbox:

> The inspection team identified what it considered to be *audit deficiencies*.  Those deficiencies included *a failure by the Firm to identify or appropriately address an error in the issuer's application of GAAP that appeared likely to be material* to the issuer's financial statements.  In addition, the deficiencies included *failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures.*
>
> * * *
>
> The deficiencies identified in both audits reviewed included deficiencies of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential; matter to support its opinion on the issuer's financial statements.
>
> * * *
>
> On the basis of the information reported by the inspection team, including the audit performance deficiencies [described previously in the report], *the Board has concerns that the Firm's system of quality controls fails to provide such reasonable assurance in at least the following respects….* The Firm's system of quality control appears not to provide sufficient assurance that the Firm will conduct all testing appropriate to a particular audit.

(Emphasis added.)

34.   A press release issued by Medbox the next day, on April 3, 2013, tacitly acknowledged that Q Accountancy was not the quality independent auditor that the Company and its shareholders needed.  The release states in part:

> While Q Accountancy Corporation's audit delivered an acceptable set of financial statements, management believes a firm more focused and supportive of emerging microcap public companies would be best suited for long term operations. *Management believes it is in the best interest of the shareholders and the company, as a whole, to make this change, although it will delay the filing of its Form 10* to the latter part of April.
>
> "The point is getting the job done with the right people. We have identified a firm and we look forward to announcing their engagement shortly," stated Dr. Bruce Bedrick, CEO of Medbox, Inc.   "Corporate governance is paramount and the company will do what is needed for the Form 10 to be viewed as favorably as possible by the SEC."

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1 | (Emphasis added.)

2 |     35.    However, the promise to find a better qualified independent auditor, like many of

3 | the promises made by defendants Mehdizadeh and Bedrick did not come to pass in time to avoid

4 | serious harm to Medbox.  Q Accountancy was only replaced in February 2015.

5 |     36.    On April 10, 2013, the Company filed its first Form 10 with the SEC.  The Form 10

6 | contains financial statements for the full years ended December 31, 2012 and 2011, audited by Q

7 | Accountancy.  The Form 10 discloses that Medbox had eight full time employees, five part time

8 | employees, and used six independent contractors.  The Form 10 contains the following disclosure

9 | about defendant Mehdizadeh:

> Prior to founding MDS, Mr. Mehdizadeh was the Director of Client Relations for the following law offices at various times from 2003 through 2008:  Law Office of Donald J. Townley; Law Offices of Frank E. Miller; Law Offices of Thomas R. Lee, Rexford Law Group; and the Moheban Law Firm.

> In 2007, Mr. Mehdizadeh was involved in the sale of his automobile to a private party. The transaction terms were in dispute by the parties and Mr. Mehdizadeh pled no-contest to using an access card (credit card) without the owner's consent. The matter was resolved with Mr. Mehdizadeh receiving probation. Mehdizadeh is still currently on probation for that offense

16 |     37.    On April 15, 2013, the Company issued a press release titled "Medbox Positions

17 | Itself as the Leader on Wall Street in the Legalized Marijuana Industry," which repeats that the

18 | Company had achieved $2 million in quarterly revenue: "Medbox is proud to report that Q1 2013

19 | was its highest revenue quarter in the company's history *at more than $2 million booked* as

20 | revenue and over $1.5 million booked as deferred revenue." (Emphasis added.)

21 |     38.    On May 21, 2013, the Company filed its quarterly report for the period ended

22 | March 31, 2013 with OTCmarkets.com and disclosed that in fact, its disclosures during April 2013

23 | were untrue: it had not "booked" "more than $2 million" in revenues and ultimately reported

24 | revenue for the quarter of $1,749,554.[4]

---

26 | [4]    Another balance sheet attached to the Company's 2012 Annual Report and apparently

27 | audited by Q Accountancy in January 2014 lists the Company's revenues for the quarter ended March 31, 2013 as only $1,245,522. *See* https://www.otciq.com/otciq/ajax/showFinancialReportById.pdf?id=115813.

302252.1

12

39.     On June 4, 2013, the Company filed a letter with the SEC requesting withdrawal of its From 10 filed in April 2013 because Medbox would "not have time to complete certain financial statement updates."

40.     On June 21, 2013, the Los Angeles County District Attorney's Office issued a press release titled "Father, Son Plead to Criminal Charges in $450,000 Unauthorized Practice of Law Case." The press release states in part:

> A father and son accused of stealing $450,000 from more than a dozen victims by offering unlicensed legal services pleaded no contest today, the Los Angeles County District Attorney's Office announced.
>
> Pejman [Vincent] Mehdizadeh, 35, of Los Angeles, told victims he was a licensed attorney or that he worked with one and that he could provide a variety of services – including obtaining green cards, loan modifications and divorces. His father, Parvis Mehdizadeh, 78, of Calabasas, assisted. Between 2002 and 2009, they took payments from 15 victims ranging from $2,000 to $200,000.
>
> * * *
>
> The younger Mehdizadeh pleaded no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000. Los Angeles County Superior Court Judge Robert J. Perry immediately sentenced him to four years in state prison, suspended, and five years of formal probation.
>
> Under the terms of a negotiated plea agreement, the son was ordered to pay back $450,000 in restitution on or by Oct. 21 or face prison time. To date, he has paid $370,000 in restitution.

41.     On July 17, 2013, the Company filed with the SEC a prospectus on Form S-1 for an initial public offering of 3 million shares of Medbox common stock at $25 per share.  Among other things, the Form S-1 states "[w]e recognize revenue in accordance with ASC 605, *Revenue Recognition*." (Emphasis in original).  The Form S-1 states Medbox only recognizes revenue when all of the following have occurred: (a) persuasive evidence of an arrangement exists; (b) the products and services have been provided to the customer; (c) the fee is fixed or determinable; and (d) collectability is reasonably assured.  Defendants Bedrick and Mehdizadeh were now listed as CEO and a director, and COO and Chairman of the Board, respectively.  Defendant Mehdizadeh's salary as COO was disclosed as $180,000 per year and defendant Bedrick's as CEO was $65,000.  The Form S-1 states defendant Iwanski would become Medbox's CFO on September 1, 2013.  As with the previously filed Form 10, the Form S-1's disclosures regarding defendant Mehdizadeh

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

302252.1

characterize his employment history as "Director of Client Relations" at various small law firms and mentioned the 2007 dispute involving the sale of an automobile, but critically makes no mention of defendant Mehdizadeh's recent felony conviction.

42.     On September 30, 2013, the Southern Investigative Reporting Foundation ("SIRF") published an article about defendant Mehdizadeh titled "Tinkerer, Lawyer, Hustler, Lies: One Man's Path to a Dope Fortune." The article describes Mehdizadeh's past pattern of dishonesty:

> In the spring of 2010, exasperated police detectives from all over Los Angeles began phoning the county's consumer affairs department to complain that an outfit calling itself the Active Lawyers Referral Service had misled its working-class customers from 2005 to 2008 by referring them to a law firm that billed them for work—but never finished the job. Their tales got positively woolly: Several claimed that Pejman Vincent Mehdizadeh, the founder of the referral service and the manager of the law firm, had posed as a lawyer and his father, Parviz, had given them legal advice as they sought work visas. (Pejman and Parviz use the names Vincent and Paul, respectively, for business.)

> Three years later the consumer affairs unit, along with the Los Angeles County district attorney's office, sought to prosecute Vincent Mehdizadeh, who, after months of wrangling, pleaded no contest to various criminal charges. He consented to pay $450,000 in restitution to his victims, thereby avoiding a four year sentence in a California state penitentiary. (His father, Parviz, pleaded no contest to one misdemeanor charge.)

> \* \* \*

> A search of Los Angeles area criminal records databases shows that from 1997 to 2007, Mehdizadeh was arrested or pleaded no contest for breaking and entering, solicitation, trespassing and credit card fraud. He declared bankruptcy in July 2010, after landing up to his neck in back taxes owed to the Internal Revenue Service. Earlier this year, he wound up in the middle of the aforementioned consumer affairs investigation.

> \* \* \*

> One area where there is little room for debate is Mehdizadeh's penchant for posing as a lawyer. After the raid on his marijuana dispensary he wrote in a signed December 2007 post on Weedtracker.com, a dormant pro-marijuana legalization website, "I have a law degree and made managing partner in my firm before the age of 26."

> Moreover, in a testimonial for a Web marketing company, Mehdizadeh signed his name "Vincent Mehdizadeh, J.D." Short for juris doctor, J.D. signals an accredited law school awarded a degree.

43.     The SIRF article also describes a number of the accounting problems Medbox had already experienced in September 2013:

For its audits and filing preparation, Medbox turned to Irvine, Calif. based Q Accountancy. But Q Accountancy had a problematic history of its own with regulators and a legacy of troubled clients. In 2012, a congressionally appointed industry watchdog group—the Public Company Accounting Oversight Board— uncovered a sweeping array of deficiencies in Q Accountancy's auditing practices. And last November the SEC sued Q's founder, Timothy Quintanilla, for issuing misleading audits based on "reckless and deficient work."

\* \* \*

How does a company that's trying to smarten its profile before selling more stock get into these jams? One way is to have no one in charge of financial oversight on a fulltime basis. Until Sept. 1, the company's finance chief, Leila Guieb, was moonlighting part-time at Medbox while she worked as an employee at Toyota Financial Services.

\* \* \*

On March 8, a Medbox press release announced a $6 million equity cash infusion, with $1 million already paid and $5 million to arrive in May. Yet, there's no sign of any of this in the company's SEC filings.

In April, Medbox filed a Form 10 as part of its effort to register its shares; the only reference to stock sales was this line in a footnote at the very end: "During January 2013, the Company received a total of $71,520 as payment for the sale of 16,000 shares of common stock during that period."

The S1 filed in July offered no clues about the whereabouts of the promised millions.

(Citations omitted.)

44.    On November 13, 2013, the Company filed an amended Form S-1 with the SEC listing defendant Mehdizadeh's position as "Chief Operating Officer and Chairman of the Board, acting principal financial officer."   The amended Form S-1 for the first time discloses that although defendant Mehdizadeh's salary was $180,000, his total compensation for 2012 was $410,706.   By contrast Medbox's net income for the full year 2012 was $327,853.   The next highest paid officer was defendant Bedrick, the Company's CEO, whose total compensation was $65,000, or approximately 14% of the amount conferred on the Company's former "Senior Consultant" and current "Chief Operating Officer and Chairman of the Board, acting principal financial officer."   Defendant Iwanski was now "expect[ed]" to become the Company's CFO "in January 2014."   The amended Form S-1 also expands – slightly – on Mehdizadeh's criminal history:

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

302252.1

During 2005-2008, Mr. Mehdizadeh was the non-attorney manager for a law firm. In 2008 the supervising attorney whom clients had retained to handle their legal matters retired and left clients without representation. The department of consumer affairs of Los Angeles investigated the matter and decided to recommend prosecution against Mr. Mehdizadeh and not Mr. Mehdizadeh's attorney employer. After a 15 count criminal complaint was filed in 2010, in order to avoid a trial and ongoing bad publicity, Mr. Mehdizadeh pled no-contest to two counts related to theft since money was accepted by the attorney and work had not been completed due to the attorney retiring. Mr. Mehdizadeh accepted the terms of the plea that called for probation and that once Mehdizadeh's probation is complete, it was pre-negotiated that the record of the incident be deleted. *Mr. Mehdizadeh maintains his innocence and believes he was unfairly targeted.*

(Emphasis added.)

45.     On November 19, 2013, defendants Mehdizadeh and Becker published Medbox's third quarter 2013 quarterly report on OTCmarkets.com, a document which was not filed with the SEC. The quarterly report states that: (a) as of September 30, 2013, the Company had total current assets of $3,276,992 and as of December 31, 2012, total current assets of $3,456,802; and (b) the Company's total assets were $6,464,170 and $3,512,670, for the third quarter of 2013 and full year 2012, respectively. The report disclosed the following results of operations: (a) revenues for the third quarter of $2,079,454; (b) revenues for the nine months ended September 30, 2013 of $5,046,634; (c) net income for the quarter of $258,945; and (d) net income for the nine months ended September 30, 2013 of $388,284. The November 19, 2013 quarterly report also refers to the Company's 2012 full year results as "restated" without any explanation.

46.     On December 19, 2013 the Company filed a letter with the SEC requesting the withdrawal of the July 17, 2013 registration statement, this time because the Company "no longer intends to raise capital by selling stock in a public offering in the immediate future."

47.     On January 21, 2014, the Company filed yet another Registration Statement on Form 10 with the SEC. The Form 10 includes audited financial statements for the years ended December 31, 2012 and December 31, 2011. The Form 10 discloses that defendant Bedrick beneficially owned 24.7% of the Company's outstanding common stock and defendant Mehdizadeh beneficially owned or controlled 63.6% of the common stock. Inexplicably, the compensation paid to defendants Bedrick and Mehdizadeh in 2012 were now changed. According

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1   to the new Form 10, defendant Bedrick received $34,729 total compensation in 2012 in his role as

2   CEO and a director, while defendant Mehdizadeh in his various titles received $262,500.

3         48.     The January 21, 2014 Form 10 includes the following financial statements which

4   conflict, without any explanation, with those filed previously on OTCmarkets.com.  According to

5   the new Form 10: (a) as of September 30, 2013, the Company had total current assets of

6   $3,338,218 (previously reported as $3,276,992) and as of December 31, 2012, total current assets

7   of $3,495,156 (previously reported as $3,456,802); and (b) the Company's total assets were

8   $7,422,866 (previously reported as $6,464,170) and $3,551,024 (previously reported as

9   $3,512,670), for the third quarter of 2013 and full year 2012, respectively.  The Form 10 discloses

10  the following results of operations, also conflicting with the previously-filed quarterly report and

11  also without explanation: (a) revenues for the quarter of $1,980,720 (previously reported as

12  $2,079,454); (b) revenues for the nine months ended September 30, 2013 of $4,801,062

13  (previously reported as $5,046,634); (c) net *loss* for the quarter of $178,925 (previously reported

14  as net *income* of $258,945); and (d) net *loss* for the nine months ended September 30, 2013 of

15  $43,825 (previously reported as net *income* of $388,284).  Notably the Form 10 makes no

16  disclosure regarding a restatement of the Company's 2012 results nor does it refer to those results

17  as restated.

18        49.     On February 14, 2014, the SEC issued a list of comments to Medbox regarding a

19  wide range of deficiencies in the January 21, 2014 Form 10 including: (a) incorrect pagination; (b)

20  misleading descriptions of Medbox's business and "geographic reach"; (c) failure to define key

21  terms; (d) failure to include necessary attachments; (e) inconsistent description of territories where

22  the Company served consulting clients (i.e., mentioning Oregon on one list and omitting Illinois,

23  Nevada, and Oregon on another); (f) failure to provide a basis for the disclosed belief that Medbox

24  was "positioned to be the leader in compliance and inventory control"; (g) failure to properly

25  discuss revenue recognition; (h) in some places the Company stated it sold a certain number of

26  machines during a certain quarter and in others the Company stated that it had sold the same

27  number during the entire year; (i) inexplicably recording $190,400 in marketable securities as a

28  liability; (j) disclosures stating there were no material changes in consolidated statement of cash

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1  flows during a certain period but disclosing significant changes in net cash from investing and

2  financing activities during the same period; and (k) failure to explain a substantial salary increase

3  for then-CEO Bedrick, in addition to numerous other problems.  The letter also states "please

4  ensure that your disclosure [regarding defendant Mehdizadeh's criminal history] encompasses all

5  aspects of Mr. Mehdizadeh's plea, including the payment of fees in restitution."

6       50.    On February 18, 2014, Citron Research released a report titled "Citron Busts

7  Medbox for Multiple Frauds – Stock Is Worthless."  The Citron report points to the numerous

8  apparent contradictions within Medbox's financial statements, past public statements, and on its

9  website.  The report concludes, "This is a Full On Fraud... It is not as if Medbox is a company

10  that has had a few reporting deficiencies amidst a small but growable business core.  Rather,

11  everything they do seems to have an underlying purpose of deception."

12       51.    Also on February 18, 2014, the Company issued a press release in response to the

13  Citron research report.  The press release admits to past financial errors and states in part:

14          "The company undertook a project to bring all accounting functions in house and
        during that lengthy process *we discovered some errors* in accounting which we

15          have since corrected in the latest financials included in the Form 10. The point is
        getting it right and being fully transparent with our shareholders at all times," stated

16          Vincent Mehdizadeh, Board Chairman at Medbox, Inc. "The company has, as part
        of those corrections, instituted better controls over financial reporting to avoid

17          further corrections. In addition, it is important to note that revenues for the nine
        months of 2013 had increased over the comparative period of the prior year (as

18          corrected) and we are continuing to add skilled people to accelerate our growth in
        2014. Unfortunately, when you are the most visible company in the space, with a

19          large market capitalization, you become a target."

20          (Emphasis added.)

21       52.    On March 31, 2014, the Company filed with the SEC an amended Form 10,

22  purporting to address the SEC's concerns.  This Form 10 now lists the following defendants as the

23  Company's officers and directors: (a) Bedrick, CEO and a director; (b) Mehdizadeh, COO and

24  Chairman of the Board; (c) Iwanski, CFO; (d) Feinstein, Vice President; and (e) Lowe, director.[5]

25  In particular, the Form 10 inserts approximately two additional sentences in the disclosure

26  regarding revenue recognition under the Company's critical accounting policies but contains no

27  _____

28  [5]    This was during the transition from Board 1 to Board 2.  Siegel and Feinstein were
appointed about one week later and defendant Mehdizadeh stepped down.

1  substantive changes.  This Form 10 includes the Company's audited financial statements for the

2  year ended December 31, 2013 for the first time.  The Form 10 was signed by defendant Bedrick

3  and contained the report of Q Accountancy expressing the opinion that Medbox's consolidated

4  financial statements "present fairly, in all material respects, the financial position of Medbox."

5  The Form 10 was now updated to contain the following disclosure regarding the legal problems of

6  defendant Mehdizadeh:

> During 2005-2008, Mr. Mehdizadeh was the non-attorney manager for a law firm.
> In 2008 the supervising attorney, Thomas R. Lee [...], whom clients had retained to
> handle their legal matters retired and left clients without representation. The
> department of consumer affairs of Los Angeles investigated the matter and decided
> to recommend prosecution against Mr. Mehdizadeh and not Mr. Mehdizadeh's
> attorney employer, Mr. Lee.  After a 15 count criminal complaint was filed in 2010,
> in order to avoid a trial and ongoing bad publicity, Mr. Mehdizadeh pled no-contest
> in 2013 to two counts related to theft that resulted in probation. Under the terms of
> a negotiated plea agreement, Mr. Mehdizadeh voluntarily paid $450,000 in
> restitution to clients of Mr. Lee's office.  Mr. Mehdizadeh accepted the terms of the
> plea that provided that once Mehdizadeh's probation is complete, the record of the
> incident be deleted.  Mr. Mehdizadeh maintains his innocence and believes he was
> unfairly targeted.

14      53.      On April 1, 2014, Medbox issued a press release titled "Medbox Generates 102%

15  Increase in Revenue for Fiscal 2013."  The press release stated quotes defendant Mehdizadeh as

16  stating "Our primary subsidiary, Medicine Dispensing Systems, has been profitable each year

17  since commencing operations in 2010, and remains profitable today."  The press release also states

18  in part:

> Full-year revenues were $5.2 million, a 101.7% increase compared to $2.6 million
> last year. The increase in revenues was due to primarily the result of recognizing
> revenue deferred from 2012 related to the completion of contracts for Arizona
> customers which was delayed by court action that was not resolved until 2013.
> Gross profit for 2013 was $2.6 million, or 50.5% gross profit margin, compared to
> gross profit of $1.5 million, or 59.4% gross profit margin for 2012.

23      54.      On April 11, 2014, the Company filed a Form 8-K disclosing that defendant

24  Feinstein and Siegel had been elected to the Medbox Board of Directors on April 9, 2014.  The

25  Form 8-K also disclosed that on April 10, 2014, defendant Mehdizadeh resigned as COO and

26  director and was appointed "Senior Strategist and Founder of the Company."

27      55.      On April 11, 2014, the SEC issued a list of comments to Medbox regarding a wide

28  range of deficiencies that remained uncorrected in the March 31, 2014 amended Form 10.  For

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

example the SEC noted that again the Company had failed to file a document with the correct pagination. The SEC "continue[d] to note inconsistencies between the description of [the] business in the registration statement and on the company's website." The SEC requested, again, more complete disclosures regarding Medbox's revenue. The SEC stated the Company had failed to sufficiently address its previous request to disclose its consideration of why Medbox "determined not to state separately its net sales and cost of sales of tangible products and its net sales and cost of sales for services." The SEC also directed the Company to include specific language in a more complete disclosure of defendant Mehdizadeh's past criminal charges and plea:

> [R]evise your disclosure to state that Mr. Mehdizadeh pleaded "no contest to two counts of felony grand theft and admitted a special allegation of engaging in a pattern of related felony conduct involving takings in excess of $100,000" and that he was ordered to pay back $450,000 in restitution. We refer you to the Los Angeles County District Attorney's Office June 21, 2013 press release. Please tell us whether Mr. Mehdizadeh has already paid the $450,000 and if not, please revise the disclosure accordingly. Also, *please remove the last sentence beginning with "Mr. Mehdizadeh maintains his innocence . . ."*

> (Emphasis added.)

56.     On April 15, 2014, in response to criticism from the SEC included in the April 11, 2014 letter, the Company amended the Form 8-K it had filed April 11, 2014.

57.     On May 13, 2014, the Company filed yet another amended Form 10 purporting to address the SEC's concerns expressed in the February 14, 2014 and April 11, 2014 letters. As of the filing of this May 13, 2014 Form 10, the Company had never publicly disclosed the existence of an Audit Committee or, if one existed who its members were. Nor was the existence of an Audit Committee mentioned in this Form 10. The May 13, 2014 Form 10 states the following in part:

> We currently have seven full time employees. We also use the services of 12 independent contractors.

> These independent contractors perform the services of accounting/bookkeeping support, machine maintenance, software support, marketing assistance, and also project manager duties in various localities nationwide. In addition, most of our sales force is on independent contractor arrangements. We currently have three independent contractors that constitute our sales force, including one who serves as sales manager, our newly appointed Vice President Matt Feinstein, and two sales

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

302252.1

agents. The Vice President receives a monthly base salary of $8,000 and the sales agents receive a monthly base salary of $1,000.  In addition, we pay commissions of approximately 5% on technology and consulting sales, which commissions are split between the Vice President and the sales agent that was assigned as the contact for the client.  We expect that Mr. Feinstein will become an employee of Medbox during the third quarter of 2014.

58.     On May 15, 2014, the Company filed its first Form 10-Q with the SEC for the quarter ended March 31, 2014.  Attached as exhibits to the 10-Q were the Sarbanes-Oxley certifications of defendants Iwanaski and Bedrick.

59.     On May 27, 2014, the SEC issued a letter to the Company describing deficiencies in the May 13, 2014 Form 10 and the May 15, 2014 Form 10-Q.  In particular, the SEC asked the Company for the third time to clarify its revenue recognition disclosures and stated the following:

> We note the allowances and refunds recorded in the first quarter due to a reduction in the number of licenses in the San Diego market *reversing $962,780 of previously recognized revenue*....  Please provide us with a detailed explanation of your basis for previously recognizing this revenue, including the specific milestones previously reached that made recognition of the revenue on the affected contracts appropriate. Also, please clarify your ongoing revenue recognition policy in terms of when it is appropriate to recognize revenue prior to obtain a license.

> * * *

> We note you have identified general and administrative expenses in the amount of $235,193 and $263,197 for the periods ended March 31, 2014 and 2013 as "Not explained." *Given the significance of these amounts to your financial statements, please expand your disclosure to include the reasons why you cannot explain what the expenses relate to and why the amount for the first quarter of 2014 decreased from the first quarter of 2013.*

(Emphasis added.)

60.     On June 10, 2014, the Company filed a Form 8-K disclosing a pair of transactions with PVMI, an entity controlled by defendant Mehdizadeh.  The first transaction is referred to in the Form 8-K as the "Bio Tech PSA" and is described as follows:

> Pursuant to the Bio Tech PSA, the Company sold to PVMI the Company's rights and claims attributable to or controlled by the Company as a result of the Company's transactions with Bio Tech Medical Software, Inc. (the "Bio Tech Rights and Claims"), in exchange for the return by PVMI to the Company of 30,000 shares of the Company's common stock. The amount of consideration paid by PVMI was determined based on the book value of the Bio Tech Rights and Claims and the closing price of the Company's common stock on June 5, 2014."

The second transaction is referred to in the Form 8-K as the "Medvend PSA" and is described as follows:

> Pursuant to the Medvend PSA, the Company sold to PVMI the Company's rights and claims attributable to or controlled by the Company as a result of the Company's transactions with those three certain stockholders of Medvend, Inc. known as Kaplan, Tartaglia and Kovan (the "Medvend Rights and Claims"), in exchange for the return by PVMI to the Company of 30,000 shares of the Company's common stock. The amount of consideration paid by PVMI was determined based on the book value of the Medvend Rights and Claims and the closing price of the Company's common stock on June 5, 2014.

Attached to the Form 8-K are the purchase and sale agreements for both transactions. Both PSA's state they were approved unanimously by Mebdox's then-Board, Board 2, on June 4, 2014 and are signed by defendant Feinstein on behalf of Medbox and defendant Mehdizadeh on behalf of PVMI. On June 5, 2014, Medbox shares closed at $20.16 per share.

61.     On July 1, 2014, Medbox issued a press release titled "Medbox Becomes a Fully Reporting Public Company – Company's Form 10 deemed effective by SEC," which states that Medbox "today announced that the Company's Form 10 filing has been deemed effective by the Securities and Exchange Commission, with no outstanding comments left to address."

62.     On July 29, 2014, the Company filed a Form 8-K disclosing that Marsala was appointed as a director and CEO on July 23, 2014, and that defendant Bedrick had resigned as President and CEO. Board 3 was now in place. The filing also discloses that Marsala's salary as CEO would be $330,000.

63.     According to a complaint later filed by the Company in an unrelated proceeding, in August 2014, the Company and defendant Mehdizadeh learned that the DOJ had served grand jury subpoenas on Q Accountancy, Medbox's then-accountant, and a CPA named Alex Anguiano. The subpoenas sought "all documents related to financial transactions involving Medbox." The service of these subpoenas and the existence of the grand jury investigation were not disclosed to Medbox's public shareholders.

64.     On August 14, 2014, the Company filed its Form 10-Q for the quarter ended June 30, 2014. The Form 10-Q was signed by Marsala and defendant Iwanski.

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

302252.1

65.     On August 22, 2014, the Company filed a Form 8-K disclosing that defendant Bedrick had resigned as a director on August 18, 2014 but would continue to serve as a consultant to Medbox and would earn a monthly fee of $12,500 in that capacity.

66.     On August 27, 2014, the Company uploaded to the investor relations portion of its website a charter for the Audit Committee of the Board, dated adopted August 6, 2014.   The charter states that the Audit Committee "shall be made up of at least three members of the Board who meet the independence and other requirements of the Securities and Exchange Commission." At this time, the composition of the Audit Committee was not disclosed and there were not three independent directors on Medbox's Board to form the Committee.

67.     On October 17, 2014, the Company filed a Form 8-K disclosing that as of October 13, defendant Mehdizadeh had resigned as an officer of Medbox but would continue to serve as a consultant to the Company and would earn $25,000 in that capacity per month, or $300,000 per year – effectively the same amount as the Company was paying its CEO, defendant Marsala.

68.     On October 21, 2014, the Company filed a Form 8-K disclosing that defendant Iwanski had resigned as CFO and defendant Mitchell would serve as the new CFO.  The Company agreed to pay defendant Iwanski severance and issued him 100,000 Restricted Stock Units "for his service to the Company."

69.     On October 27, 2014, the Board appointed a special committee consisting of defendants Lowe, Siegel, Love, and Marsala – the entire Medbox Board.  The special committee was to investigate whether evidence of wrongdoing existed as to: (a) the documents sought by the grand jury and the subpoenas served on the Company's accountants; or (b) the allegations in a letter to the SEC from a former employee of Medbox including allegations of insider trading and other securities fraud against Mehdizadeh.   The formation of the special committee and the allegations in the letter to the SEC were not immediately disclosed.

70.     On October 28, 2014, the Company filed a Form 8-K with the SEC disclosing that Love had been elected to the Board on October 22, 2014.   The Form 8-K for the first time disclosed in an SEC filing the existence of an Audit Committee of the Board of Medbox when it

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1  stated Love "was also elected to serve as Chairperson of the Audit Committee." If any other

2  director served on the Audit Committee was not disclosed.

3        71.    On October 31, 2014, the Company filed a Form 8-K with the SEC disclosing that

4  defendant Feinstein had resigned as a director of the Company on October 30, 2014 but would

5  remain employed as a vice president of Medbox. The Current Board was now fully in place.

6                    **THE TRUTH BEGINS TO EMERGE**

7        72.    Also on October 31, 2014, the Company filed a Form 8-K with the SEC disclosing:

8    On October 27, 2014, the Board of Directors of Medbox, Inc. (the "Company")
9    appointed a special board committee, composed of all four of its current directors,
     that is, three independent directors and its recently appointed Chief Executive
10   Officer/Chairman of the Board, to investigate (i) *a letter from a former Company*
     *employee to the Securities and Exchange Commission alleging wrongdoing by a*
11   *former officer of the Company who is currently a consultant to the Company*, and
     (ii) *a federal grand jury document subpoena served in August 2014 on the*
12   *Company's accountants by the U.S. Department of Justice, to ascertain what*
     *implications, if any, the subpoena or the letter may have with respect to the*
13   *Company.*

14   (Emphasis added.)

15       73.    At some time during November 2014, Medbox and various former directors and

16  officers of the Company, including Mehdizadeh, received subpoenas from the SEC. The SEC

17  subpoenas sought documents and testimony related to the Company's revenue recognition

18  policies, financial disclosures, private placements of stock, and third parties who had invested in

19  or otherwise engaged in financial transactions with Medbox.

20       74.    On November 3, 2014, a press release was issued by defendant Mehdizadeh titled

21  "Medbox Comments on Recent 8-K Filing." The press release, which appeared neither in a

22  Medbox SEC filing nor on the Company's investor relations page, states in part:

23   LOS ANGELES, Nov. 3, 2014 /PRNewswire/ -- *Medbox, Inc.*, (OTCQB: MDBX),
     the leading licensing, infrastructure and security specialist, patented technology
24   provider, and partner to the cannabis industry, commented on the recent 8-K filing
     discussing matters pertaining to a former employee of the company who filed an
25   employment claim and sent a letter to certain government agencies asserting claims
     against the Company. *The former employee subsequently lost the employment*
26   *claim*. However, the Company is now internally investigating the letter's contents to
     ascertain validity of the claims.

27
     The 8-K references that the Board of Directors of Medbox, Inc. appointed a special
28   board committee to investigate, review, and evaluate a letter involving the

     SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

Company, sent in May 2014 to certain government agencies by a former employee of Medbox. *Within the last few weeks, Medbox was awarded a judgment against this employee* on his employment claims, which demanded $1.5 million in damages related to the Company's alleged wrongdoing. Prior to litigation of the employment claim, and after repeated settlement demands were made by the former employee and rebuffed by Medbox, the employment claim was filed and sent along with a letter to government agencies by the former employee, alleging wrongdoing by the company.

Mr. Vincent Mehdizadeh, Founder and Consultant to Medbox stated, "The former employee vowed to retaliate against the Company in any way he could after his illegal cash demands of the company were ignored. It now appears that writing a letter to government agencies filled with factual inaccuracies and blatant falsehoods was the most effective way to facilitate that goal."

Current management commented that the Company has not found any indications that the subject matter contained in the letter is true concerning the conduct of prior officers of the company.  However, the company's internal investigation on the matter is still in process. *The Company also clarified that no subpoenas have been served on the Company, it's current or former officers, or anyone affiliated to the Company.*

Mr. Mehdizadeh added, "I painstakingly put together the best management team and Board of Directors in our sector for a reason, and in their judgment this voluntary disclosure is what good public companies that have nothing to hide should do. The company will continue to demonstrate to shareholders, the investment community, and all other public company participants in the cannabis sector, how a well-run and respectable public company should operate. Medbox has and will continue to be the gold-standard for accountability."

(Emphasis added.)  No judgment against a former employee, or any litigation involving one, has been disclosed in the Company's public filings.

75.    On November 4, 2014, *TheStreet.com* published an article titled "Medbox Says Ex-employee Wrote Letter to SEC, Accountants Subpoenaed," which states in part:

While Medbox did not identify the former officer who is the subject of the letter to the SEC, the company's own filings show that three officers resigned this year and stayed on as consultants.

Mehdizadeh resigned as COO and director in April, but was then appointed as a senior strategist.  He resigned again last month, retaining a relationship as a consultant.

Bruce Bedrick resigned as CEO in July and resigned from the board in August, remaining as a consultant.

CFO Thomas Iwanski resigned last month, but agreed to stay on as a consultant.

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

76.     On November 6, 2014, defendant Mehdizadeh issued a press release, this time under his own name, stating "Online Publication Retracts Headline Implying Medbox is Under Investigation." The press release states in part:

> LOS ANGELES, CA / ACCESSWIRE / November 6, 2014 / P. Vincent Mehdizadeh - Founder and Majority shareholder of Medbox, Inc. (OTCQB: MDBX) commented today that online publications, thestreet.com and thedeal.com retracted a headline that *incorrectly asserted that Medbox is under investigation by the SEC.*
>
> "I am personally relieved that the headline and key pieces of the article were corrected," commented Mehdizadeh. "However, the damage to investor confidence yesterday was substantial and I am meeting with my legal team to discuss possible remedies available to make an example out of this online publication and to ensure incorrect information is never disclosed about the company again."

(Emphasis added.)

77.     On November 7, 2014, the Company filed a Form 8-K with the SEC stating:

> The news release issued Monday, November 3, 2014 under the headline "Medbox Comments on Recent 8-K Filing" *was not authorized by Medbox, Inc.* (the "Company") for distribution. The 8-K filed by the Company on Friday, October 31, 2014, should be used as a reference for information regarding this matter. The filing is available on the website of the Securities and Exchange Commission.

(Emphasis added.)

<u>The SEC Investigation</u>

78.     On November 12, 2014, the Company filed its Form 10-Q with the SEC for the quarter ended September 30, 2014.  The Form 10-Q reiterates that, contrary to the statements in the November 3, 2014 press release, the SEC had issued a subpoena to the Company.  The Form 10-Q states in part:

> On November 10, 2014, the Los Angeles Regional Office of the Securities and Exchange Commission (the "SEC") notified the Company that *it is conducting an investigation pertaining to the Company and issued a subpoena to the Company for documents from December 1, 2011 to the present* relating to the matters it is reviewing. The Company plans to cooperate fully with the SEC staff to complete the investigation on a timely basis.

(Emphasis added.)

79.     On December 2, 2014, the Current Board informed defendant Mehdizadeh that its members believed Medbox had incorrectly recognized revenue under his leadership.  Mehdizadeh responded by threatening to remove the Board.

80.     On December 4, 2014, defendant Mehdizadeh threatened to remove the entire Board via written consent and then informed the Company's directors and officers they were "terminated as officers of any and all Medbox companies, with cause, effective immediately." Mehdizadeh thereafter agreed to withdraw his termination demand.

81.     On December 12, 2014, Mehdizadeh again threatened to fire Medbox management.

82.     On December 22, 2014, the Company filed a Form 8-K with the SEC disclosing: "On December 16, 2014, the Board of Directors of Medbox, Inc. (the "Company") amended the Company's Amended and Restated Bylaws to prohibit action by written consent without a meeting of the stockholders of the Company." This modification of the Company's bylaws could only have been target at the actions of one individual: defendant Mehdizadeh, the Company's majority shareholder and the only person able to take any action by written consent.

The Restatement

83.     On December 30, 2014, the Company filed a Form 8-K with the SEC disclosing, among other things, that the Company had been served with a subpoena for the federal grand jury and that Medbox would be required to restate its financial statements for the full year 2013 and the first three quarters of 2014. The Form 8-K also disclosed that "[o]n December 22, 2014, the Board of Directors of the Company amended the Company's Amended and Restated Bylaws to permit action by written consent without a meeting of the stockholders of the Company, effectively rescinding the amendment entered into on December 16, 2014." The reason for this abrupt reversal, and what Mehdizadeh promised the Current Board in return, has not been disclosed. The Form 8-K also states in part:

> On December 24, 2014, the Board of Directors of the Company determined to *amend and restate the financial statements of the Company for the year ended December 31, 2013, the third and fourth quarters of 2013 and the first three quarters of 2014.*

> In October 2014 the Board of Directors of the Company appointed a special board committee (the "Special Committee") to investigate a federal grand jury subpoena pertaining to the Company which was served upon the Company's accountants as well as certain alleged wrongdoing raised by a former employee of the Company. *Thereafter the Company received subpoenas from the federal grand jury and the Securities and Exchange Commission.* In connection with its investigation of these matters, the Special Committee in conjunction with the Audit Committee initiated an internal review by management and by an outside professional advisor of certain

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

302252.1

prior period financial reporting of the Company. The outside professional advisor reviewed the Company's revenue recognition methodology for certain contracts for the third and fourth quarters of 2013. As a result of certain errors discovered in connection with the review by management and its professional advisor, the Audit Committee, upon management's recommendation, concluded on December 24, 2014 that the consolidated financial statements for the year ended December 31, 2013 and for the third and fourth quarters therein, as well as for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014, together with all three, six and nine month financial information contained therein, should no longer be relied upon and will be restated to correct the errors. Therefore, all earnings press releases and similar prior communications issued by the Company as well as other prior statements made by or on behalf of the Company relating to financial reporting or results for those periods should not be relied upon. Lastly, as part of the investigation process, *the Company will also examine its financial statements for 2012 and the first two quarters of 2013 and if necessary correct those as well.*

The errors which led to the announced restatements relate to revenue recognition on some contracts with customers as to which it appears that *revenue had been recognized too soon. The company intends to correct the errors in its financial statements to bring them into conformity with accounting principles generally accepted in the United States of America (GAAP) and SEC regulations.* The restated financial statements will recognize revenue at a later time as up-front payments are recognized over the longer of the contract period or the customer relationship, revenue is deferred until key contingencies are removed and it is clear the revenue has been earned in accordance with GAAP and SEC regulations. The Company's internal review, including a review of the practices and procedures that led to the errors, preparation of fourth quarter and full year 2014 financial statements and restatement of prior periods are not yet concluded, and the actual impact of the revenue recognition corrections and other adjustments that may arise from the ongoing internal review of the Company's prior and future financial results *may vary materially.*

As a result of the preliminary findings of the ongoing internal review, management is continuing to assess the Company's disclosure controls and procedures and internal controls over financial reporting. The Company does not expect to reach a final conclusion as to this assessment until completion of the restatement process. Since management has not completed its assessment of its disclosure controls and procedures, including internal control over financial reporting, there can be no assurance that additional control deficiencies that could be material weaknesses will not be identified. The Company has previously disclosed that its disclosure controls and procedures and internal controls over financial reporting were not effective.

The Chief Financial Officer of the Company discussed these matters with the Company's independent registered public accounting firm, Q Accountancy Corporation.

* * *

Guy Marsala, the Chief Executive Officer of the Company and a member of the Special Committee, has determined to resign from the Special Committee, effective as of December 16, 2014, in order for the members of the Special Committee to consist exclusively of outside independent directors.

(Emphasis added.)

302252.1

84.     On the same day, the Company issued a press release covering the subject matter of the Form 8-K. The press release states that the Company "plans to engage an independent CPA firm to consult with and assist the Company's staff in preparing the restated financial statements as soon as possible."

85.     Also on December 30, 2014, defendant Mehdizadeh issued a letter to Medbox shareholders. In the letter, defendant Mehdizadeh stated in his view no independent CPA was necessary and doubled-down on his failed accounting and that of former-CFO Iwanski and the Q Accountancy auditor. The letter states in part:

"Up until 3 months ago, *I was involved in almost every decision the company made*.... In my opinion, one of the keys to Medbox's success has been superior corporate messaging and timely dissemination of information to our shareholders.

Since that point in time a little over two years ago, I have made it my mission to take the company from being a non-reporting pinksheet to being a fully reporting SEC Filer. I took it upon myself to set these goals and achieve them for the benefit of the company and its shareholders. We did this to have an increased level of transparency so that investors can think of Medbox as the public company standard for respectability and reliability in the newly emerging marijuana industry that was taking shape. As a result, we engaged a Public Company Accounting and Oversight Board (PCAOB) registered auditor, Q Accountancy Corporation, and also hired a full-time Chief Financial Officer, Thomas Iwanski, a CPA with excellent references and extensive public company experience.

Since the company engaged Mr. Iwanski and Q Accountancy Corporation, I also recruited a star-studded board and together we appointed Guy Marsala to lead the company as the Chief Executive Officer. As it was explained to me, in situations where a new CEO is brought on, they typically look to appoint their own Chief Financial Officer. Thus, when Mr. Marsala decided to replace Mr. Iwanski as CFO, I did not give it a second thought, although I was sad to see him go since his experience with public company oversight was superb.

Today, the company's current management issued a statement regarding the company's financials. *Prior management, including Mr. Iwanski and the company's current auditor, both disagree with current management's position on the matter. Both the current auditor and prior CFO have made their opinions known to current management, to no avail.* Both have stated that they had support for recognizing revenue in the periods in which they were recognized. However, the company's current CFO has a difference of opinion on that aspect and believes that the revenue in question should be recognized in later periods, which has now resulted in a proposed restatement set to occur. *This fact along with the fact that the revenue items in dispute amount to less than 10% of the total revenue booked for 2013, was not accurately discussed in the disclosure released this morning.*

(Emphasis added.)

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

86.     According to a court filing later made by the Company, this press release was "false and/or misleading" in that it misleadingly minimized the extent of accounting problems.

87.     On December 31, 2014, the Company filed a Form 8-K with the SEC disclosing that on December 17, 2014, the Company appointed Siegel as the Chairman of the Board.  The accompanying press release states:

> Mr. Guy Marsala, Medbox CEO, commented, "Over the course of this year, Medbox has evolved from an entrepreneurial firm to a professionally managed organization with a world class management team and Board of Directors."

88.     On January 9, 2015, the Company filed a notice of action by written consent of stockholders.  The form disclosed that defendant Mehdizadeh had used his power to act by written consent without a meeting to remove *the entire Board* and install directors loyal to him.  Pursuant to the written consent, effective January 29, 2015, Medbox's Board of Directors would become: defendants Feinstein, Ortega, Trecek, and Mehdizadeh.  The disclosure states in part:

> This Information Statement… is being furnished to the holders ("Stockholders") of the class of Common Stock, par value $0.001 per share ("Common Stock"), and Preferred Stock, $0.001 par value, of Medbox, Inc., a Nevada corporation ("Company"), by Mr. P. Vincent Mehdizadeh who is the beneficial owner of a majority of the voting power of the Company ("Majority Stockholder"). Mr. Mehdizadeh is the president and controlling shareholder of both PVM International, Inc., a California corporation ("PVMI") and Vincent Chase, Inc.,[6] a California corporation ("VCI").
>
> The purpose of the Information Statement is to provide notice that, on January 9, 2015 ("Consent Date"), the Majority Stockholder, PVMI and VCI executed a written consent ("Consent Action"), as permitted under Nevada law and the Amended and Restated Bylaws of the Company, as further amended ("Bylaws"), approving the election of four (4) successor directors as the Company's entire board of directors to serve until the next annual meeting of stockholders and until their successors are elected and qualified.  After the effective time of the Consent Action, the board of directors and the Majority Stockholder may decide to add additional directors, including persons who formerly served as officers or directors of the Company.

89.     On January 16, 2015, the Company filed a complaint in Los Angeles Superior Court disputing the legal effectiveness of the January 9, 2015 written consent.  According to the Company's complaint, the Current Board has discovered "significant" evidence related to Mehdizadeh's conduct while employed in various capacities at Medbox.  The complaint states that Mehdizadeh: (a) engaged in manipulation of Medbox's revenue recognition and other financial

---

[6]     Vincent Chance, Inc. ("VCI") is an entity wholly owned by defendant Mehdizadeh.

1  disclosures; (b) made public statements related to Medbox that contained false and/or misleading

2  information; (c) potentially violated numerous securities laws; (d) engaged in what appear to be

3  improper transactions involving third-party affiliates; (e) made material misrepresentations to

4  Medbox investors and/or potential investors; and (f) ignored and/or attempted to hide significant

5  accounting and other financial control and oversight issues existing at Medbox.

6      90.    On January 21, 2015, the Company, defendant Mehdizadeh, and Mehdizadeh's

7  wholly owned entities, PVMI and VCI, entered an agreement to resolve the action filed on January

8  16.  Pursuant to the agreement: (a) Mehdizadeh and his entities canceled and withdrew the written

9  consent; (b) the Company and Mehdizadeh and his entities agreed to vote in favor of and not

10  remove defendants Siegel, Lowe, Love, and Marsala for a period of 12 months; (c) Medbox would

11  dismiss its complaint; (d) the Board would meet with defendant Mehdizadeh on specified dates to

12  discuss matters of interest or concern to defendant Mehdizadeh "as a stockholder of the

13  Company"; (e) Mehdizadeh would have the right to appoint a person nominated by him to be a

14  fifth member of Medbox's Board; and (f) Mehdizadeh and his entities would, on or before January

15  25, 2015, obtain a $1 million investment in Company stock via a private placement.  Notably,

16  however, the Current Board did not pursue financial damages against defendant Mehdizadeh.  The

17  agreement additionally stated:

18      **Consulting Arrangements and Contact with Staff.** VM confirms that all prior
        consulting agreements or similar arrangements between him and Medbox or any of

19      its subsidiaries have been terminated,[7] and that for a period commencing on the date
        of this Agreement and terminating upon the end of the Voting Agreement Term,

20      *VM will not (i) seek or purport to act on behalf of Medbox or any subsidiary as a
        consultant, agent, or otherwise* or (ii) except as authorized by the Board or this

21      Agreement, *contact or interfere with any Medbox employees, consultants, directors
        or shareholders, whether on or off Medbox's premises and whether in person, by*

22      *mail, email, Edgar filings, the internet, press releases, other form of public
        announcements, or in any other manner.* Notwithstanding this Section, VM Group

23      shall be permitted to have a supervised visit at Medbox's headquarters where they
        can gather personal belongings and make copies of files for the purpose of

24      compiling a financial summary prepared by an accounting firm to disclose to
        Medbox and Medbox's financial consulting firm for assistance with its

25      investigation of the 2012, 2013 and 2014 financial statements. VM Group will also
        be allowed to provide to Medbox an operations summary to assist current

26      management in running the business.

27                                          * * *

28  _____
    [7]    "VM" means defendant Mehdizadeh.

    SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

**Board Consultations with VM.** During the Voting Agreement Term, Medbox shall cause one or more of its directors, initially Siegel, to meet and confer in good faith with VM not less infrequently than semi-monthly (or on a different frequency as mutually agreed by Medbox and VM) to hear and discuss any matters of interest or concern of VM, as a shareholder of Medbox. These matters shall initially include, but are not limited to (i) adequacy of Medbox's staffing, (ii) implementation of new consulting arrangements related to executed amendments to client consulting agreements previously agreed to by Medbox but not yet tendered to clients as promised, to ensure client satisfaction and (iii) Medbox's completion of its evaluation, through Singer Lewak, of its prior period financial reporting

91.     Concurrently, the Current Board, the Company, defendant Mehdizdeh, PVMI, and VCI entered a voting agreement.  Pursuant to the voting agreement, defendants Mehdizadeh, Siegel, Low, Love, Marsala, PVMI, and VCI agreed to vote their Medbox shares to: (a) maintain the Board as five members; and (b) elect defendants Siegel, Lowe, Love, and Marsala.  The agreement likewise prevents any of the parties to it from taking "any action to remove" defendants Siegel, Lowe, Love, or Marsala

92.     At present, Medbox is the subject of an SEC investigation and the Company and/or one or some of the defendants named herein are implicated in the DOJ grand jury investigation. As securities class action was filed against the Company, in the U.S. District Court for the Central District of California, also on January 21, 2015, Case No. 2:15-cv-00426, naming defendants Mehdizadeh, Bedrick, Iwanski, Marsala, and Mitchell.  Medbox common stock, which was trading above $30 per in share in April 2013 is currently trading at approximately $2.19 per share.

93.     On February 6, 2015, the Company issued a Form 8-K disclosing that the Board had appointed a new independent Auditor, Marcum LLP, and "effectively dismissed" Q Accountancy, "other than with regard to any restatement of the Company's financial statements for periods prior to the fiscal year ending December 31, 2014." Attached as an exhibit to the Form 8-K was a letter from Q Accountancy stating in part:

We have read the statements made by Medbox Inc., which we understand will be filed with the Securities and Exchange Commission, pursuant to Item 4.01 of Form 8-K, as part of the Form 8- K of Medbox, Inc. dated February 5, 2015. We agree with the statements concerning our Firm in such Form 8-K. However, on December 30, 2014, Medbox, Inc. filed with the Securities and Exchange Commission a Form 8-K that included certain matters pursuant to Item 4.02 regarding revenue recognition methodology for certain contracts. As of February 5, 2015, we have not reviewed or performed any additional procedures on the outcome of those matters.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1    We have no basis to agree or disagree with any other statements made under Item
2    4.01.

3        94.     On March 4, 2015, defendant Mehdizadeh disclosed that he had agreed to sell the
4    majority of Medbox shares under his control to Lizada Capital LLC for approximately $15
5    million.

6        95.     On March 9, 2015, the Company filed a Form 8-K describing the results of its
7    financial review.  The Form 8-K stated in part:

8        As a result of certain errors described below, discovered in connection with such
         comprehensive   review,   the   Audit   Committee,   upon   management's
9        recommendation, concluded on March 6, 2015 that, in addition to the restatements
         announced in the Original 8-K, the consolidated financial statements for the year
10       ended December 31, 2012, together with all three, six and nine month financial
         information contained therein, and the quarterly information for the first two
11       quarters of the 2013 fiscal year, should no longer be relied upon and will be restated
         to correct the errors. Therefore, all earnings press releases and similar prior
12       communications issued by the Company as well as other prior statements made by
         or on behalf of the Company relating to financial reporting or results for those
13       periods should not be relied upon.

14       Management and its professional advisor have completed the review of revenues
         recognized and related contracts for the years 2012 and 2013 and interim period for
15       the nine months ended September 30, 2014. Conclusions thus far from the review
         include:
16
         1) revenue on some contracts with customers was recognized before all required
17       revenue recognition criteria were met, resulting in an overstatement of revenue in
         ranges of approximately $1,300,000 to $1,500,000, $3,000,000 to $3,200,000 and
18       $600,000 to $900,000 for the years 2012, 2013 and the nine months ended
         September 30, 2014, respectively;
19
         2) certain transactions with related parties in ranges of approximately $500,000 to
20       $600,000 and $800,000 to $900,000, for 2012 and 2013, respectively were
         improperly recorded as revenue instead of additional paid in capital in stockholders'
21       equity; and,

22       3) certain inventory costs were capitalized improperly resulting in an
         understatement of cost of sales. Costs of approximately $600,000 and in a range of
23       approximately $1,300,000 to $1,400,000, for 2013 and the nine months ended
         September 30, 2014, respectively previously reported in inventory in 2013 and
24       2014, respectively, will be recorded as cost of sales in the statement of operations
         for 2013 and the nine months ended September 30, 2014, respectively. These costs
25       incurred prior to executing a contract with a customer, seeking licenses and
         locations and closing on real estate to operate a dispensary or cultivation center
26       should have been recorded as current period expense.

27       96.     On March 11, 2015, the Company filed an amended Form 10 containing its restated
28   financial results.

---

302252.1

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

33

97.     To date, the Company has not been compensated for the significant financial harm caused by defendant Mehdizadeh's wrongdoing or the breaches of fiduciary duties of the Current Board members, nor have the necessary corporate governance enhancements been made.

## DAMAGES TO THE COMPANY

98.     Medbox has been, and will continue to be, severely damaged and injured by defendants' misconduct.  As a direct and proximate result of the defendants' conduct, Medbox has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

    a.     a decreased ability to obtain financing to sustain continued operations at a loss;

    b.     costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

    c.     costs incurred in incentive and/or bonus compensation paid to employees based on artificially inflated test accession numbers;

    d.     substantial loss of market capital;

    e.     costs already incurred and to be incurred defending against the pending securities class action;

    f.     costs already incurred defending government investigations, subpoenas, and suits; and

    g.     any fines that are a result of the Company's violations federal and state law.

99.     In addition, Medbox's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company has still not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

100.     The actions complained of herein have irreparably damaged Medbox's corporate image and goodwill.  For at least the foreseeable future, Medbox will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Medbox's ability to raise equity capital or debt on favorable terms in the future is now impaired.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

101.    Plaintiff brings this action derivatively in the right and for the benefit of Medbox to redress injuries suffered, and to be suffered, by Medbox as a direct result of breaches of fiduciary duty by the individual defendants.  Medbox is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

102.    The Current Board of Medbox consists of the following four defendants: Siegel, Lowe, Marsala, and Love.  Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Current Board would be futile, and therefore, excused.  This is because the Current Board members were appointed unilaterally by defendant Mehdizadeh and have failed to hold him accountable in the face of his serious wrongdoing.    Thus, demand on the Board is futile, and therefore excused.

103.    Demand is excused as to the Current Board because it has failed to convene a functioning, properly composed Audit Committee.  The Audit Committee charter requires that the Committee be comprised of *three* independent directors.  However, in violation of the charter, the Medbox Audit Committee is comprised of only two: defendants Siegel and Love.  Because Medbox is beset by accounting problems and has disseminated numerous obviously false and/or misleading financial statements, the Company is in desperate need of a functioning Audit Committee.  However, the Current Board has declined to constitute a properly constituted Audit Committee.  As a result, demand is excused as to the entire Current Board.

**Demand Is Excused Because A Majority Of The Director Defendants Face A Substantial Likelihood Of Liability Based Upon Their Actions**

**Defendant Marsala Is Not Independent**

104.    Defendant Marsala is incapable of considering a demand to take action in an independent and disinterested manner because he is employed fulltime as Medbox's CEO.  As a result, he is reliant on the good will of his other Board members to maintain his primary employment.  Demand is excused as to defendant Marsala.

**Audit Committee Defendants Love And Siegel Breached Their Fiduciary Duties**

105.     Defendants Love and Siegel are the members of the Audit Committee of Medbox. In this capacity, they have responsibility for overseeing the adequacy of the Company's internal controls over financial disclosure, and reviewing its financial statements and press releases. However, even though these defendants *know* the Company has issued misleading financial statements in the recent past and *know* that Medbox's internal controls have failed to prevent accounting manipulation, they have disclosed no specific action to strengthen Medbox's internal controls or taken action against Mehdizadeh and/or Bedrick to recoup financial damages for the harm suffered by the Company.  As a result, demand is excused as to defendants Siegel and Love due to their breaches of fiduciary duties as Audit Committee members.

**Compensation Committee and Governance and Nominating Committee Defendants Siegel and Lowe Breached Their Fiduciary Duties**

106.     Defendants Siegel and Lowe are the members of the Compensation Committee and the Governance and Nominating Committee.  Both of these defendants serve not only on the Current Board, but also were members of Boards 2 and 3.  Because both Siegel and Lowe have served on Medbox's Board since approximately April of 2014, they have long been aware of the serious accounting and disclosure problems at Medbox.  Nevertheless, they approved excessive and indefensible salaries for defendant Mehdizadeh in their capacities as Compensation Committee members – even though they knew him to be engaged in wrongdoing, as was evident from conflicting financial statements, the DOJ and SEC investigations, and his issuance of misleading press releases.  Moreover, in their capacities as Governance and Nominating Committee members, defendants Siegel and Lowe failed to conduct adequate evaluations of the Company's corporate governance processes and failed to institute functioning corporate governance policies even though they knew the Company was in desperate need of them.  As a result, demand is excused as to defendants Siegel and Lowe due to their breaches of fiduciary duties in their capacities as members of the Compensation Committee and Governance and Nominating Committee.

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

**Prior-Serving Defendants Marsala, Siegel, and Lowe Breached Their Fiduciary Duties**

107.    Defendants Marsala, Siegel and Lowe, a majority of the Current Board, were on the Board in August 2014 when they were alerted to the DOJ grand jury investigation of Medbox's financial transactions.   However, these three defendants failed to *take any action at all* to investigate or disclose same for three months.   They did, however, approve excessive compensation for defendants Bedrick and Mehdizadeh in August and October of 2014, respectively, even though they knew the DOJ investigation implicated Mehdizadeh and they knew that the Company's financial statements from the time defendant Bedrick was CEO had been misleading.   Likewise, defendants Marsala, Siegel, and Lowe failed to convene an Audit Committee at all until October 2014, let alone a properly comprised one, which still does not exist, even though they were aware of the allegations regarding the Company's financial statements, the DOJ grand jury investigation, and the SEC whistleblower complaint.   As a result, demand is excused as to defendants Marsala, Siegel, and Lowe.

**The Entire Current Board Breached Its Fiduciary Duties**

108.    Defendants Marsala, Siegel, Lowe, and Love have admitted in Court filings that they are aware of pervasive and serious wrongdoing by defendant Mehdizadeh.   However, they have not sought money damages against him or publicly disclosed any meaningful corporate governance enhancements at Medbox.   In fact, the Current Board agreed to resolve its suit against defendant Mehdizadeh in return for his promise to let them remain entrenched and immune from challenge as directors.   By their failure to take appropriate action against defendant Mehdizadeh, the entire Current Board has breached its fiduciary duties and demand is excused as to each member.

109.    As particularized herein, to properly prosecute this lawsuit, the Director Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions.   This they have refused to do thus far, and will not do in the future.   A majority of the Director Defendants are exposed to potential liability for breaching their fiduciary duties by consciously or recklessly declining to institute functioning internal controls even though they knew or were reckless in not

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1    knowing that the Company's internal controls were seriously deficient and accounting chicanery

2    was rampant.  Thus, demand on the Director Defendants is futile.

3                                              **COUNT I**

4                                  **Breach of Fiduciary Duty**

5           110.    Plaintiff incorporates by reference and realleges each and every allegation set forth

6    above, as though fully set forth herein.

7           111.    Each defendant owes and owed to the Company the duty to exercise candor, good

8    faith, and loyalty in the management and administration of Medbox's business and affairs,

9    particularly with respect to maintaining compliance with applicable laws and regulations in core

10   areas of the Company's business, as well as controls over disclosure.

11          112.    Defendants' conduct set forth herein was due to their intentional, reckless, or

12   negligent breach of the fiduciary duties they owed to the Company.  Defendants intentionally,

13   recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and

14   interests of Medbox.

15          113.    In breach of their fiduciary duties owed to Medbox, defendants willfully

16   participated in and caused the Company to expend unnecessarily its corporate funds, and failed to

17   properly oversee Medbox's business, rendering them personally liable to the Company for

18   breaching their fiduciary duties.

19          114.    As a direct and proximate result of defendants' breaches of their fiduciary

20   obligations, Medbox has sustained and continues to sustain significant damages.  As a result of the

21   misconduct alleged herein, defendants are liable to the Company.

22                                             **COUNT II**

23                                      **Abuse of Control**

24          115.    Plaintiff incorporates by reference and realleges each and every allegation set forth

25   above, as though fully set forth herein.

26          116.    Defendants' misconduct alleged herein constituted an abuse of their ability to

27   control and influence Medbox, for which they are legally responsible.

28

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

117.    As a direct and proximate result of defendants' abuse of control, Medbox has sustained significant damages.

118.    As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Medbox has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

119.    By reason of the foregoing, Medbox has been damaged.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Medbox and that plaintiff is an adequate representative of the Company;

B.    Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Medbox;

C.    Determining and awarding to Medbox the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.    Directing Medbox and the defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Medbox and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

////

////

////

////

////

1.   A proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.   A provision to permit the shareholders of Medbox to nominate at least three candidates for election to the Board;

3.   A proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.   Determining and awarding to Medbox exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.   Awarding Medbox restitution from defendants, and each of them;

G.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.   Granting such other and further equitable relief as this Court may deem just and proper.

Dated: March 27, 2015                    MATTHEW L. SHARP, LTD.

                                         _____/s/ Matthew L. Sharp_____
                                         Matthew L. Sharp
                                         Nevada Bar No. 4746
                                         432 Ridge Street
                                         Reno, Nevada 89501
                                         Telephone:    (775) 324-1500
                                         Facsimile:    (775) 284-0675
                                         Email: Matt@MattSharpLaw.com


                                         ROBERT I. HARWOOD
                                         MATTHEW M. HOUSTON
                                         BENJAMIN I. SACHS-MICHAELS
                                         HARWOOD FEFFER LLP
                                         488 Madison Avenue
                                         New York, NY 10022
                                         Telephone:    (212) 935-7400
                                         Facsimile:    (212) 753-3630

---

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LOUIS BOYARSKY
GLANCY BINKOW & GOLDBERG LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160
Email: LBoyarsky@glancylaw.com

*Attorneys for Plaintiff*

302252.1

1

2 **<u>MEDBOX, INC. VERIFICATION</u>**

3

4    I, Tyler Gray, hereby verify that I am familiar with the allegations in the Complaint, and

5 that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the

6 best of my knowledge, information, and belief.

7

8

9

10 Date: 3/27/15

11                                 Tyler Gray

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE

302252.1